**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-20596-CIV-ALTONAGA/Torres**

**METALIZING TECHNICAL SERVICES, LLC,**

     Plaintiff,

v.

**BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY**, *et al.*,

     Defendants.

_____/

**ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW**

     **THIS CAUSE** came before the Court for a non-jury trial.  The Court has carefully considered the testimony of the witnesses, the exhibits admitted in evidence, the parties' written submissions, and applicable law.  Based on its review of the record and pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and conclusions of law, and awards Plaintiff, Metalizing Technical Services, LLC ("MTS"), the sum of $278,038.22.  The Court will enter a separate money judgment in favor of MTS as required by Federal Rule of Civil Procedure 52(a), reserving jurisdiction to address the parties' requests for costs and attorneys' fees.

**I. INTRODUCTION**

     This case involves disputes that arose during a 2018–2020 construction project (the "Project") to repair and rehabilitate the State Road A1A/MacArthur Causeway East Bridge in Miami-Dade County, Florida ("MacArthur Causeway").  (*See* Joint Pretrial Stip. ("Stipulation")

[ECF No. 81] 9).[1]  The Court has subject matter jurisdiction under 28 U.S.C. section 1332 because the parties are diverse and the amount in controversy exceeds $75,000.  (*See* Apr. 14, 2022 Order [ECF No. 65] 11–13).

Intervenor Defendant, LEAD Engineering Contractors, LLC ("LEAD") entered a Prime Contract with the Florida Department of Transportation ("FDOT" or the "Department") to serve as the Project's general contractor.  (*See* Stip. 9).  LEAD then entered a Subcontract with MTS for MTS "to perform certain scopes of work for LEAD under its Prime Contract with FDOT."  (*Id.*). MTS was responsible for repairing hundreds of locations on the MacArthur Causeway.  (*See* Monaghan Test., Aug. 3, 2022 Tr. [ECF No. 113] 60:23–24).

Defendant, Berkshire Hathaway Specialty Insurance Company ("Berkshire"), agreed to provide LEAD with a surety bond[2] to secure payment and performance.  (*See* Stip. 9).  LEAD intervened in this action because the suretyship relationship with Berkshire requires LEAD, as general contractor, and its principals to indemnify any payments made by Berkshire.  (*See id.* 5).

The relationship between MTS and LEAD reached an impasse after a car accident killed one of MTS's employees and injured another as they worked on the Project (the "Accident").  (*See id.* 10).  As a result of the Accident, LEAD learned that MTS had not maintained workers' compensation, general liability, or excess liability insurance, as Article 6.2 of the Subcontract required.  (*See* Exs. List, Ex. P1, MTS Subcontract Agreement [ECF No. 129-24] ("Subcontract") 40–41).  After MTS failed to cure the breach, LEAD properly terminated the Subcontract.  (*See* June 9, 2022 Order [ECF No. 84] 10).  LEAD subsequently entered a new Subcontract with

---

[1] The Court relies on the pagination generated by the CM/ECF system, which appears in the header on all filings.

[2] Successful bidders for FDOT construction work are required to obtain a surety bond in an amount equal to the awarded contract price.  *See* Fla. Stat. § 337.18.

Southeast Bridge FL Corporation ("SE Bridge") to complete the unfinished work.  (*See generally* Exs. List, Ex. J7, SE Bridge Subcontract [ECF No. 129-6]).

Upon termination, MTS claimed it was owed money on the Subcontract for work performed, and it reasserted earlier claims for costs incurred during an unexpected work stoppage and because of hazardous materials discovered on the Project.  (*See* Exs. List, Ex. P46, Jan. 25, 2021 Letter [ECF No. 129-34] 1).  Defendants claimed they did not owe MTS any money because they were entitled to setoffs for MTS's deficient work and insurance-related damages that exceeded the remaining balance on the Subcontract.  (*See id.*).

MTS sent Berkshire a claim on the bond for $1,196,948.74.  (*See* Exs. List, Ex. D155, Mar. 4, 2021 Letter [ECF No. 129-102] 2).  Berkshire denied the claim.  (*See id.* 2, 7).

On March 2, 2021, MTS filed a one-count Complaint against Berkshire in Putnam County Circuit Court alleging breach of bond.  (*See* Notice of Removal, Ex. A, Compl. [ECF No. 1-1] 11–14).  Berkshire removed the case to the United States District Court for the Middle District of Florida.  (*See generally* Notice of Removal [ECF No. 1]).  That court transferred the case to this District.  (*See* Feb. 25, 2022 Order [ECF No. 41] 3).

On April 21, 2022, the Court entered an Order [ECF No. 67] granting LEAD's Motion to Intervene [ECF No. 14].  (*See* Apr. 21, 2022 Order 1; *see also generally* Apr. 14, 2022 Order [ECF No. 65]).  On June 9, 2022, the Court granted in part Defendants' Motion for Partial Summary Judgment [ECF No. 71], finding MTS breached the Subcontract, but leaving several issues to be decided at a trial on damages.  (*See* June 9, 2022 Order 10–15).  Over the course of several days,[3]

---

[3] Transcripts from August 3, 2022 [ECF No. 113], August 4, 2022 [ECF No. 114], John Bolton's August 9, 2022 testimony [ECF No. 115], and Bolton's August 10, 2022 testimony [ECF No. 116] appear on the CM/ECF system.  The Court relies on rough transcripts for the days that do not appear on the docket.

the Court received evidence. (*See* Paperless Minute Entries [ECF Nos. 97, 98, 108, 109, 112, 125, 127, 128]).

MTS presents three claims for damages against Defendants.  MTS claims it is entitled to recover for labor and equipment costs it incurred because of a work stoppage, additional funds for costs associated with unexpected hazardous materials on the Project (*see* Pl.'s Prop. Findings & Concl. [ECF No. 80-1] 5), and the unpaid balance owed under the Subcontract for work performed before the termination (*see* Stip. 9).  Defendants present 19 separate setoff claims against MTS. (*See* Defs.' Prop. Findings & Concl. [ECF No. 79] 34–35).

## II. FINDINGS OF FACT

For ease of presentation, the Court adopts the parties' statement of uncontested facts as follows:

On March 26, 2018, LEAD entered [the Prime Contract] with [the FDOT] to serve as the general contractor for bridge repair and rehabilitation along [the MacArthur Causeway].

LEAD, as principal, and Berkshire, as surety, provided a Florida Statute [Section] 337.18 Contract Bond No. 47SUR300057010004 on the Project in the penal sum amount of Twelve Million Nine Hundred Sixty-Two Thousand One Hundred Eighty-Three and 16/100 Dollars ($12,962,183.16).

LEAD entered [the Subcontract] with [MTS] dated July 25, 2018 under which MTS was to perform certain scopes of work for LEAD under [the Prime Contract].

MTS made a claim for additional labor, materials, equipment, and supplies furnished to the Project on account of a demobilization and remobilization required by Hurricane Dorian.

MTS made a claim for additional labor, materials, equipment, and supplies furnished to the Project on account of a demobilization and remobilization required by Super Bowl LIV.

As of December 23, 2021, MTS's remaining unpaid subcontract balance was $682,339.47.

MTS[] claims its remaining subcontract balance of $682,339.47, plus its [h]azardous [m]aterials claim in the amount of $215,546.57 and stop work order claim in the amount of $40,168.03, minus any setoffs Defendants prove at trial.

Defendants claim that MTS is not entitled to its subcontract balance and have asserted setoffs against same in the amount of $954,327 for damages General Contractor alleges it incurred and will continue to incur due, as follows:

- $260,920 for construction-related damages to complete and correct MTS'[s] work and for additional maintenance of traffic costs;

- $134,095 for increased workers' compensation insurance costs;

- $306,291 for increased general liability insurance costs;

- $206,211 for increased excess liability insurance costs; and

- $46,810 for special damages for attorneys' fees for the termination of MTS's Subcontract which amount MTS has stipulated is reasonable.

On or about March 16, 2020, [the Accident] occurred . . . resulting in a workers' compensation claim[].

The Accident was not the fault of MTS or LEAD.

At the time of the Accident, MTS did not have the workers' compensation [], commercial general liability [], or excess liability [] insurance coverages required by the Subcontract.

LEAD exercised its right to terminate the [S]ubcontract for lack of the required coverages on April 23, 2020.  LEAD reasonably incurred $46,810.00 in special damages for attorneys' fees for the termination of its subcontract with MTS. Because MTS did not have the [r]equired [workers' compensation] coverage at the time of the Accident, vertical liability was triggered and the [workers' compensation] [c]laim became a covered loss under LEAD's 2019–20 [workers' compensation] policy.

LEAD incurred an additional premium cost under its 2019–20 [workers' compensation] policy to cover MTS's uninsured work.

The [workers' compensation] [c]laim caused an increase to LEAD's 2020–21 [workers' compensation] premium.

The [workers' compensation] [c]laim caused or will cause an increase to LEAD's 2021–22, 2022–23, and 2023–24 [workers' compensation] premiums.

LEAD entered [the SE Bridge Subcontract] dated May 12, 2020 and fully executed on May 18, 2020.

John Bolton, P.E. of Bolton, Perez & Associates ("BP&A") served as the Construction Engineering & Inspection [("CEI")] Consultant's Senior Project Engineer on the Project.

On May 22, 2020, [Bolton] provided LEAD with a list of photos with descriptions of MTS'[s] work which he entitled "FIN Number: 436522-1, Contract No.: E6K72, Metalizing Deficiencies 5/20/20."

(Stip. 8–11 (alterations added; paragraph numbers omitted)).

The Court summarizes the remaining relevant factual findings as to each of the claims below.

After entering the Prime Contract (*see id.* 9), LEAD, under the leadership of its CEO, Mauricio Gonzalez, appointed Frank Serrano its Project Manager. (*See* Serrano Test., Aug. 11, 2022 Tr.). Under the LEAD-MTS Subcontract, MTS was supposed to perform specialized work: all work relating to (1) metalizing, (2) concrete Class V Painting, (3) epoxy crack injection, (4) crack injection, (5) beam repairs, (6) strand splice repair, and (7) structural steel painting. (*See* Subcontract 52–53). Under Article 3.1.3 of the Subcontract, time was of the essence. (*See id.* 16).

MTS began operations onsite on August 27, 2018. (*See* Trial Demonstrative – Timeline of Events). MTS, under the leadership of its CEO, Jerrod Monaghan, had Armando Cardona manage its field work. (Monaghan Test., Aug. 3, 2022 Tr. 71:25–72:4). Cardona also assisted with putting together MTS's claims for additional compensation. (*See* Cardona Test., Aug. 4, 2022 Tr. 93:5–13).

The Subcontract is the primary document governing MTS's performance; Article 3.3.13 of the Subcontract incorporates the Prime Contract. (*See* Subcontract 25). In Article 1.1, the Subcontract also incorporates "all other contract documents as defined or referred to in the Prime

Contract[,]" including the 2018 FDOT Standard Specifications (Exs. List, Ex. D198 [ECF No. 129-115]) and the Quality Control Plan (Exs. List, Ex. J3 [ECF No. 129-3]).   (Subcontract 1 (alteration added)).

Much of the responsibility for overseeing and approving the Project rests with the CEI, the Director of the Office of Construction at the FDOT.   (*See* Specifications 49).   Bolton of BP&A was the Senior Project Engineer.   (*See* Stip. 11).

It is standard FDOT practice to delegate administration of its projects to outside firms like BP&A.   The FDOT often "maintains representation in administering construction projects through Professional Services contracts," and consequently FDOT projects can be managed by "either in-house CEI or Consultant CEI personnel."   (Fla. Dep't of Transp., Constr. Project Admin. Manual 117 (2022) (last visited Dec. 9, 2022)).[4]   "The Department entrusts the Consultant with the responsibility of administering the project(s) and []implement[ing] actions based on their authority[.]"   (*Id.* (alterations added)).

After the Accident, it came to light that MTS did not have the workers' compensation, commercial general liability, or excess liability insurance coverages required by the Subcontract. (*See* Stip. 10).   LEAD sent MTS Notices of Default (*see, e.g.*, Exs. List, Ex. D68, Apr. 16, 2020 Letter [ECF No. 129-80] 1); and gave MTS opportunities to cure, but MTS failed to do so (*see* Exs. List, Ex. D79, May 7, 2020 Letter [ECF No. 129-86] 1).   On April 23, 2020, LEAD exercised its right to terminate the Subcontract.   (*See* Stip. 10).

Upon termination, deficiencies with MTS's cathodic protection work remained.   (*See* Exs. List, Ex. J8, Deficiency List [ECF No. 129-7] 2–25).   LEAD entered an agreement to complete MTS's work with SE Bridge.   (*See* SE Bridge Subcontract 46).   On July 30, 2020, Ivan Hay sent

---

[4]  The Court took notice of the Manual in its June 9, 2022 Order.   (*See id.* 6 n.4).

Serrano the FDOT's Final Acceptance (Exs. List, Ex. D111 [ECF No. 93]), confirming "[a]ll deficient items identified in the punch list have been corrected or satisfactorily addressed." (*Id.* 1 (alteration added)).

The sections that follow expand on the facts relevant to each party's claims.

### A. MTS's Claims

#### 1. *Work Stoppage*

MTS is seeking $11,000.00 for costs incurred during an unexpected work stoppage. (*See* Pl.'s Prop. Findings & Concl. 7 (seeking $40,168.03 for work stoppage claim); Sept. 6, 2022 Tr. (conceding $11,000.00 is a more appropriate valuation of the claim)).

On September 24, 2018, Bolton ordered MTS to stop its metalizing on the Project while he determined whether MTS could ignore a technical specification and reduce the quantity of metalizing being applied to save costs. (*See* Exs. List, Ex. J6, Mar. 4, 2020 Email [ECF No. 129-5] 1). MTS sent its crew home on September 25, 2018, while Bolton waited for an answer from the FDOT. (*See id.* 15). On October 17, 2018, MTS received notice that it could proceed with metalizing, and its crew resumed work on the Project. (*See id.*).

MTS subsequently sent LEAD a letter (Exs. List, Ex. P12 [ECF No. 129-28]) requesting a meeting about issues on the Project. (*See generally id.*). MTS identified Bolton's work stoppage as one of the issues. (*See id.* 2). The parties were unable to resolve their differences, and MTS sent LEAD the first invoice for costs related to the work stoppage. (*See* Mar. 4, 2020 Email 16). It sent two more invoices with additional related costs and additional reminders. (*See id.*).

On March 4, 2020, MTS sent LEAD a letter seeking to recover the costs associated with the work stoppage claim. (*See id.* 13). Cardona was responsible for pricing the claim. (*See* Cardona Test., Aug. 4, 2022 Tr. 125:25–126:1).

CASE NO. 22-20596-CIV-ALTONAGA/Torres

MTS's work stoppage claim identified $37,768.45 in equipment costs due to "idled equipment from the metalizing crew that had to be completely stopped" during the delay; $1,587.90 in labor costs for four specialized metalizers; and $811.69 in other costs. (*See* Mar. 4, 2020 Email 13). Cardona admitted to several issues with his calculations. For example, when he was asked to describe the equipment he was pricing, he responded: "I don't know. I wasn't there during that time period." (Cardona Test., Aug.4, 2022 Tr. 127:22–25; 129:1–3).

Cardona also admitted that, although he could not remember how he calculated the prices (*see id.* 130:14–18), he thinks he did not generate prices for the equipment on his own, because MTS was not willing to pay for a Blue Book[5] subscription (*see id.* 130:2–11). Instead, he thinks he relied on information from past claims and used those to approximate costs. (*See id.*). Cardona did not know whether he used the standby rate for idle equipment. (*See id.* 132:18–21). This makes a difference because standby time is supposed to be charged at 50 percent of the cost of equipment in active use. (*See* Serrano Test., Aug. 11, 2022). The standby time rate should have been used because MTS was pricing the equipment during a work stoppage. At trial, MTS's counsel admitted to the mistake and attempted to stipulate to a reduced the claim of $11,000.00. (*See* Sept. 6, 2022 Tr.).

---

[5] Serrano explained:

> The Blue Book is a system that is used throughout the entire state where you enter the equipment that you want a price for and that will give you the different prices for that equipment. It gives you monthly rate, weekly rates and daily rates and even hourly rates for that particular equipment and that's what the DOT requires for you to utilize when you are requesting any additional money or back charges or so forth.

(Serrano Test., Aug. 11, 2022 Tr.).

### 2.    *Hazardous Materials*

MTS is seeking $215,546.57 for costs associated with unexpected hazardous materials detected on the Project.  (*See* Pl.'s Prop. Findings & Concl. 5).  On January 10, 2018, during the bidding stage, the FDOT was asked whether there was "any lead in the paint removal[,]" to which it responded that "Lead, Cadmium, and Chromium were not detected[.]"   (Subcontract 124 (alterations added)).  This answer suggested there were no hazardous materials involved with the paint removal process.

After it began operations, MTS became aware of possible hazardous materials on site and informed the CEI and LEAD.  (*See* Monaghan Test., Aug. 3, 2022 Tr. 75:2–22).  LEAD hired GLE Associates, Inc. ("GLE") to conduct additional toxicity sampling.  (*See* Exs. List, Ex. J15, Claim Denial [ECF No. 129-14] 16).  GLE conducted the sampling and issued a report concluding "Chromium, Lead, and Zinc were detected above the reporting limit for the representative painted surface samples."  (*Id.* 20).

The Prime Contract, FDOT Standard Specifications, and Subcontract address the process by which LEAD, and MTS through LEAD, can pursue additional compensation from the FDOT for unforeseen costs resulting from the discovery of hazardous materials.  Article 5.2.1 of the Subcontract provides that "[f]ailure to comply with the claims presentation terms and conditions of the Contract shall be deemed an absolute waiver of any claims not presented in accordance therewith."  (Subcontract 36 (alteration added)).   Article 5.2.2 outlines how a subcontractor submits a claim for additional compensation:

> Upon Subcontractor's written request, . . . Contractor may submit to the [FDOT] the claims or requests for any additional compensation . . . for which [the FDOT] is or may be liable and institute an action or proceeding to recovery any claim by Subcontractor or appeal on behalf of Subcontractor from any ruling or decision of the [FDOT] . . . .   Subcontractor shall post whatever security may be required by Contractor to cover Contractor's costs and expenses . . . .   Subcontractor's written

> request to appeal an [FDOT] ruling or decision must be delivered to Contractor
> within the earlier of five (5) calendar days from Contractor's notice to
> Subcontractor of [the FDOT]'s ruling or decision, or as otherwise provided under
> the Prime Contract [between the FDOT and LEAD], or Subcontractor shall be
> deemed to have irrevocably waived its claim. If Subcontractor fails to post the
> security required by this Article, Subcontractor shall be deemed to have irrevocably
> waived its claims.

(*Id.* (alterations added)).  FDOT Standard Specification 5-12 provides that, "for preservation" of a

claim for "extra compensation . . . due to . . . differing site conditions . . . . [s]ubmission of timely

notice of intent" is a "condition precedent" to bringing a proceeding to recover for the claim.

(Specifications 53 (alterations added)).

LEAD submitted a Notice of Intent to the FDOT to pursue additional compensation for

hazardous materials encountered on the Project.  (*See* Claim Denial 13).  The discovery of

hazardous materials affected MTS's work.  The hazardous materials impacted MTS's

"sandblasting and painting operations of the structural steel in the center of the bridge."

(Monaghan Test., Aug. 3, 2022 Tr. 76:5–7).  According to Monaghan,

> in this case, now it's a hazardous or what we call hot paint, so now it's a hot zone.
> It changes all — many of the facets and dynamics of the project.  For environmental
> concerns, for safety concerns for the applicators, for the workers, for the general
> public to be, you know, riding a bicycle over the bridge.  If we're sandblasting
> underneath, we need to make sure that we protected those folks as well.

(*Id.* 76:10–17).  MTS claims it incurred additional costs, including those associated with handling

hazardous materials, such as special monitoring and storage; personal protective equipment and

worker protection costs resulting from the need for medical tests, decontamination, and face

masks; and additional labor, special equipment, special certification, and material costs.  (*See*

*generally* Exs. List, Ex. J13, Jan. 21, 2021 Letter [ECF No. 129-12]).[6]

---

[6] There is some dispute whether MTS incurred all the hazardous materials costs claimed.  MTS tasked
Cardona with putting together the claim (*see* Cardona Test., Aug. 4, 2022 Tr. 98:14–24), and there is
evidence suggesting the claim he compiled was overinclusive.  In a March 31, 2020 Email (Exs. List, Ex.
D62 [ECF No. 129–78]) seeking information from MTS employees about costs incurred due to hazardous

At summary judgment, Defendant urged the Court to find that MTS waived its hazardous materials claim by failing to comply with Subcontract Article 5.2.2.  (*See* June 9, 2022 Order 6–21).  According to Defendant, after Bolton denied the claim, MTS failed to request an appeal of the decision and did not post required security.  (*See id.*).  MTS insisted it was not obligated to comply with these requirements, because Bolton did not have the authority to issue a final decision on its claim, and so the Subcontract requirements were not triggered.  (*See generally* Pl.'s Resp. to Defs.' Mot. for Summ. J. [ECF No. 77]).  The Court denied summary judgment upon finding that Bolton's authority to issue the claim denial on behalf of the FDOT was a disputed fact.  (*See* June 9, 2022 Order 15).  The Court now finds Bolton had the authority to issue the claim denial on behalf of the FDOT based on the concurrence of the Department and the parties' actions.

MTS submitted its first hazardous materials claim on May 6, 2020.  (*See generally* Exs. List, Ex. D78, May 6, 2020 Email [ECF No. 129-85]).  LEAD responded, explaining deficiencies with the claim.  (*See generally* Exs. List, Ex. D80, May 8, 2020 Letter [ECF No. 129-87]).  MTS addressed the deficiencies (*see* Exs. List, Ex. D114 [ECF No. 129-94]), and LEAD responded with additional "comments for which MTS needs to rectify and/or provide further information" (Exs. List, Ex. D116, Aug. 21, 2020 Letter [ECF No. 129-95] 1).  There were "three and four back and forths [over] the next few months" between the parties regarding the claim.  (Cardona Test., Aug. 4, 2022 Tr. 104:17–23 (alteration added)).

MTS sent a revised claim package to Berkshire listing all sums it believed it was owed, including the hazardous materials claim.  (*See generally* Exs. List, Ex. J11, Jan. 6, 2021 Letter [ECF No. 129-10]).  LEAD responded, stating it agreed "there was additional work involved with

---

materials, Cardona stated: "The FDOT will at first deny the claim, then eventually admit entitlement but try to negotiate the number way down."  (*Id.* 1).  He further said: "As we can anticipate this we have to inflate the claim to it's [sic] absolute maximum as long as it is reasonable."  (*Id.* (alteration added)).

the handling of the hazardous materials encountered[,]" but MTS still had not "sufficiently explained and supported the scope and the amount of its claimed additional work, as compared to the original contract scope of work[.]" (Exs. List, Ex. J12, Jan. 14, 2021 Letter [ECF No. 129-11] 1 (emphasis omitted)).  MTS sent Berkshire a response to LEAD's questions, providing additional support for each component of the claim.  (*See generally* Jan. 21, 2021 Letter).

Bolton had the authority to investigate and implement the FDOT's decision on the claim. Bolton's role was to evaluate claims: he gathered the relevant facts, reviewed the claims, formulated an opinion, reviewed his position with the FDOT, and then — with the FDOT's concurrence — forwarded his response to the general contractor.  (*See* Bolton Test., Aug. 9, 2022 Tr. [ECF No. 115] 12:21–25).  Before Bolton could evaluate MTS's claim and issue a decision on behalf of the FDOT, LEAD, as the general contractor, was required to certify it.  (*See* Exs. List, Ex. D149, Jan. 22, 2021 Email [ECF No. 129-99] 1).

On January 22, 2021, Monaghan sent Bolton an email attaching MTS's January 21, 2021 Letter with responses to LEAD's questions.  (*See id.* 3–17).  LEAD had not certified the claim yet as required.  Bolton responded to Monaghan, explaining the requirement that LEAD first certify the claim.  (*See id.* 1).  Bolton also reminded Monaghan that the claim must be submitted by LEAD within 180 days after Final Acceptance of the Project.  (*See id.*).

On January 25, 2021, LEAD finally submitted MTS's Certified Claim to the FDOT, certifying in a letter to Bolton, that it was submitting the claim in good faith in accordance with "the formalities required under Florida law and under oath" but the "certification [was] based on the certification from MTS[.]"  (Exs. List, Ex. P46, Jan. 25, 2021 Letter [ECF No. 129-34] 3 (alterations added)).

On February 24, 2021, Bolton denied the Certified Claim.  (*See* Claim Denial 9).  Bolton

obtained the FDOT's concurrence before issuing it.  (*See* Bolton Test., Aug. 9, 2022 Tr. 13:1–3).

The claim denial concludes "[i]t is *our* opinion that LEAD/MTS is not entitled to any additional

compensation."  (Claim Denial 9 (alteration and emphasis added)).  The posture of the claim

denial, following LEAD's submission of the Certified Claim after multiple discussions between

the parties, and Bolton's credible testimony that he was acting under the guidance and authority

assigned to him by the FDOT, support the conclusion that the claim denial was the FDOT's

decision on the Claim.

On February 26, 2021, LEAD informed MTS about the FDOT's claim denial and explained

the requirements of Article 5.2.2 of the Subcontract, conditions precedent to LEAD appealing the

FDOT's decision.  (*See* Exs. List, Ex. J16 [ECF No. 129-15]); Feb. 26, 2021 Letter 1).  Again,

Article 5.2.2 requires: (i) paying all costs for an appeal, including LEAD's attorneys' fees; (ii)

rendering all assistance required by LEAD; and (iii) posting security to cover LEAD's costs and

expenses, including attorneys' fees.  (*See* Subcontract 36). LEAD included legal fees it expected

to incur.  (*See* Feb. 26, 2021 Letter 3).  LEAD advised MTS it needed to provide, "by no later than

March 8, 2021, a clear and detailed basis for the objection to the FDOT's denial of the claim[.]"

(*Id.* 1 (alteration added)).

Monaghan understood LEAD's position.  (*See* Monaghan Test., Aug. 3, 2022 Tr. 83:9–

17).  On March 5, 2021, LEAD extended the deadline for the security.  (*See id.*).

On March 10, 2021, LEAD sent a Response (Exs. List, Ex. P51 [ECF No. 129-35]) to the

claim denial stating "[s]hould the Department disagree with either the entitlement or the

quantification of the additional compensation requested in the certified claim . . . , then consider

this our written protest and [LEAD]'s request to refer this matter to the Disputes Resolution

Board." (*Id.* 7 (alterations added)).  MTS still refused to post security.  (*See* Monaghan Test., Aug. 4, 2022 Tr. 78:9–14).

On March 26 and 29, 2021, the parties met to discuss the claim.  (*See* Exs. List, Ex. D161, Apr. 2, 2021 Email [ECF No. 129-106] 1).  The FDOT had an interest in settling so it could close the Project books.  (*See* Bolton Test., Aug. 10, 2022 Tr. 55:2–5).  The subsequent negotiations did not negate the finality of the FDOT's February 24 decision — the FDOT was only willing to negotiate to eliminate the prospect of an appeal.

On April 2, 2021, Bolton advised Monaghan and Cardona that the parties had agreed to settle all claims for $219,000 (*see* Exs. List, Ex. D160, Apr. 2, 2021 Email [ECF No. 129-105] 1), plus $13,450 to LEAD for markups (*see* Exs. List, Ex. D165, May 6, 2021 Letter [ECF No. 129-108]).  On April 7, 2021, MTS disputed the terms of the settlement.  (*See* Exs. List, Ex. P53, Apr. 7, 2021 Letter [ECF No. 129-36] 3).  LEAD responded in disagreement.  (*See generally* Exs. List, Ex. D163, Apr. 22, 2021 Letter [ECF No. 129-107]).

On May 6, 2021, LEAD informed the FDOT that it would accept the hazardous materials claim settlement, although MTS was not in agreement unless LEAD paid the remaining Subcontract balance.  (*See generally* Exs. List, Ex. D165, May 6, 2021 Letter [ECF No. 129-108]).  LEAD and the FDOT entered a Supplemental Agreement that included "$219,000 to compensate MTS for all additional compensation, extra work, additional time, impacts, and delays due to the presence of hazardous materials at the project[.]"  (Exs. List, Ex. D174, Suppl. Agreement [ECF No. 129-110] 2 (alteration added)).

On November 15, 2021, LEAD attempted to tender the $219,000.00 payment to MTS.  (*See* Exs. List, Ex. J19, Nov. 15, 2021 Letter [ECF No. 129-17] 1).  MTS rejected payment but later accepted when LEAD clarified that "its tender of payment was not and is not based on MTS'[s]

waiver of its positions or of any rights as to what MTS believes it is entitled to payment[.]" (Exs. List, Ex. J20, Dec. 7, 2021 Letter [ECF No. 129-18] 1 (alterations added)).  MTS here seeks the remaining $215,546.57 it believes it is owed on the claim.

### 3. The Unpaid Subcontract Balance

MTS's final damages claim is for the balance due for the work MTS performed prior to its termination.  The balance is $682,339.47, minus whatever setoffs Defendants are entitled to.  (*See* Stip. 9).

### B.   Defendants' Damages Claims

Defendants' claims consist of construction-related and insurance-related damages.

### 1.   Construction-Related Setoffs[7]

#### *Defendants' Class V Painting*

When MTS was terminated, it had not completed the Class V Painting.  (*See id.*).  LEAD was going to pay MTS $0.52 per square foot, for a total of $33,620.00.  (*See* Subcontract 57). Defendants claim they are owed a $58,791.51 setoff for the cost of completing the Class V Painting.  (*See* Defs.' Prop. Findings & Concl. 34).  MTS admits it is liable but disagrees as to the amount owed.  (*See* Pl.'s Prop. Findings & Concl. 5).

There is no evidence that LEAD received a quote from the original bidders before subcontracting with SE Bridge to complete the Class V Painting.  SE Bridge charged LEAD $1.30 per square foot to complete the Class V Painting.  (*See* Pasco Test., Sept. 6, 2022 Tr.; SE Bridge Subcontract 2).  By determining the amount LEAD paid above the Subcontract price, Defendants

---

[7] Most of the setoffs include markups of ten percent for the first $50,000 in damages and five percent for everything above $50,000.  (*See* Pasco Test., Sept. 6, 2022 Tr.).  The labor, equipment, and materials costs associated with supporting SE Bridge include a 17.5 percent markup.  (*See id.*).  The extended maintenance of traffic ("MOT") includes a different markup based on each component of the claim.

calculated that MTS should pay LEAD $53,610.96, plus markup.  (*See* Pasco Test., Sept. 6, 2022 Tr.).

MTS insists the correct amount is $43,301.00. (*See* Pl.'s Prop. Findings & Concl. 5). Monaghan explained: "The backup bidder on the project, which would be the second lowest bidder, if you will, was Joe Mori Painting, at a $1.05 per square foot." (Monaghan Test., Aug. 3, 2022 Tr. 95:23–96:6).  After the termination, Monaghan called Joe Mori Painting to confirm it was still available.  (*See id.*).

### Mobilization of SE Bridge

Defendants state they are owed $15,750.00 for costs associated with mobilization of SE Bridge.  This amount comes from the SE Bridge Subcontract and SE Bridge Invoice (*see* Exs. List, Ex. J10, June 24, 2022 Invoice [ECF No. 129-9]), plus a five percent markup (*see* Pasco Test., Sept. 6, 2022 Tr.).  SE Bridge incurred these mobilization costs because it had to bring in crew, trailers, generators, tools, and air compressors to perform the work.  (*See* Gonzalez Test., Aug. 10, 2022 Tr.).  MTS did not present evidence to refute LEAD's costs.   LEAD is entitled to this setoff.

### Re-Work of MTS Metalizing, Connection Plates, and Zinc Silica Painting

Defendants claim they are owed $113,851.50 for costs incurred for SE Bridge to re-work MTS's deficient cathodic protection.  This amount appears in a June 24, 2020 SE Bridge invoice showing a charge of $108,430.00 for 2,710.75 square feet of metalizing work, at a rate of $40.00 per square foot.  (*See* Pasco Test., Sept. 6, 2022 Tr.).  The $113,851.50 include a five percent markup.  (*See* Exs. List, Ex. D248, Summ. of Constr. Backcharges [ECF No. 129-128]). Defendants also claim they are owed $18,742.50 for connection plates and $11,889.28 for the zinc silica (overcoat) painting SE Bridge completed.  (*See id.*).  MTS asserts the metalizing re-work, additional connection plates, and zinc silica coating were not necessary.

The Project documents contain specifications for the metalizing[8] work to reinforce the Causeway's cathodic protection system.[9]  The purpose for metalizing a bridge is to "protect the reenforcing steel that is on the inside of concrete from corrosion." (*Id.*).  The cathodic protection work on the Project was broken down into three components: "arc-sprayed zinc cathodic protection" (Subcontract 199); installation of "sacrificial cathodic protection pile jackets" (*id.* 205); and "pier bulk anode assembly" (*id.* 210).  MTS was responsible for the arc-spraying component. (*See* Monaghan Test., Aug. 3, 2022 Tr. 27:6–7).

Arc-spraying consisted of: completing repairs to the concrete; sandblasting the concrete surface so the anode will stick to the surface; spraying the zinc on the raw concrete; using duct tape to cover the raw metalizing to the areas where connection plates will be attached and then applying zinc silica paint as an overcoat over the rest of the metalized area; attaching connection plates on top of the raw metalizing work; connecting the plates to an electric wire that is connected to the steel cathode inside the concrete; and applying an epoxy seal.

Cathodic Protection Specialist ("CPS"), Leandro Etcheverry, oversaw the cathodic protection work on the Project. (*See* Monaghan Test., Aug. 3, 2022 Tr. 28:21–23).  The CPS is responsible for quality assurance. (*See* Subcontract 199).  For the arc-spraying, the CPS is responsible for conducting bond strength testing to ensure the anode sticks to the concrete. (*See* Monaghan Test., Aug. 3, 2022 Tr. 29:9–21).  The CPS also ensures the anode is thick enough. (*See id.* 30:2–8).

---

[8] Metalizing means "covering an object with molten metal." (Monaghan Test., Aug. 3, 2022 Tr. 13:11–18).

[9] Cathodic protection is a method used to control the corrosion of metal surfaces, such as the steel inside the MacArthur Causeway. (*See* Costa Test., Sept. 6, 2022 Tr.).

CASE NO. 22-20596-CIV-ALTONAGA/Torres

Bolton was required to approve the cathodic protection work. (*See* Bolton Test., Aug. 9, 2022 Tr. 13:4–6). When trying to finish a project, Bolton goes "through the project" and "list[s] all of the deficient items on the project that the contractor needs to complete before [he] will accept the project." (*Id.* 13:7–15 (alterations added)). Items not in compliance with the Subcontract must be completed for LEAD to receive FDOT final acceptance. (*See id.*).

The first sign that MTS's cathodic protection work was deficient came in February 2020, when Bolton informed Etcheverry and Serrano that the "metalizing looks significantly deteriorated," and he wanted "to ensure that it is performing properly[.]" (Exs. List, Ex. D51, Feb. 11, 2020 Email [ECF No. 129-77] 2 (alteration added)). Bolton later advised Serrano that he "observed many surfaces with [m]etalizing without the connection plates installed and connected[.]" (Exs. List, Ex. D66, Apr. 16, 2020 Email [ECF No. 129-79] 2 (alterations added)). Bolton also advised Carlos Chapman, a member of his staff, that there were no connection plates on the surfaces MTS had repaired. (*See* Bolton Test., Aug. 10, 2022 Tr. [ECF No. 116] 5:25–8:1). On May 22, 2020, Bolton provided LEAD with a punchlist containing photos and descriptions of MTS's work. (*See* Stip. 11; *see* Exs. List, Ex. J8, Deficiency List [ECF No. 129-7] 2–25).

It was "critical" for LEAD to promptly retain a replacement subcontractor to complete and correct MTS's work. (Defs.' Prop. Findings & Concl. 14). The FDOT is LEAD's "most significant client." (*Id.*). If LEAD did not finish the job on time, daily liquidated damages of $4,866 would be assessed. (*See* Gonzalez Test., Aug. 8, 2022 Tr.). SE Bridge provided LEAD the most expeditious option. (*See id.*). And although LEAD did not receive any formal written quotes other than SE Bridge's before hiring SE Bridge, LEAD "went out and checked with various companies that were available." (*Id.*).

The parties disagree about whether MTS satisfied the specification requirements for the cathodic protection work.  Notably, Defendants' cathodic protection expert, Jorge Costa, P.E., was the only witness with a CP 4 certification, the highest certification for cathodic protection specialists.  (*See* Costa Test., Sept. 6, 2022 Tr.).  Defendants break the deficiencies down into three categories: metalizing, connection plates, and zinc silica.

First, LEAD paid SE Bridge to complete MTS's deficient metalizing.  Bolton's punchlist pointed to several areas where MTS had failed to metalize according to the specifications.  (*See generally* Deficiency List).  From a review of Etcheverry's data on the thickness of the molten zinc, Costa was able to conclude not enough metalized coating was applied.  (*See* Costa Test., Sept. 6, 2022 Tr.).

Second, LEAD paid SE Bridge to add connection plates where these were missing.  The punchlist indicated some metalized faces were missing connection plates.  (*See generally* Deficiency List).  Connection plates are critical for the cathodic protection system; without connection plates, there is no electrical connection between the molten zinc and the steel inside the concrete.  (*See* Costa Test., Sept. 6, 2022 Tr.).

MTS asserts that connection plates were not missing because connection plates on one face of the repaired footer was sufficient.  (*See* Monaghan Test., Aug. 3, 2022 Tr. 106:11–16).  But in some places, Bolton's pictures show loose wires; loose wires are indicative of missing connection plates.  (*See* Deficiency List 19–20).  And MTS is incorrect that only one connection plate was required on each metalized face; the Metalizing Details Diagram and Etcheverry's Quality Control Plan indicate two connection plates are required on each metalized face.  (*See* Exs. List, Ex. J1, Metalizing Details Diagram [ECF No. 129-1]; Exs. List, Ex. J3, Quality Control Plan [ECF No. 129-3] ("Each metallized area within girders shall have two connection plates.")).

Third, LEAD paid SE Bridge to complete and/or re-work the zinc silica coating. Etcheverry's report shows not enough zinc silica coating was applied. (*See* Costa Test., Sept. 6, 2022 Tr.). Costa was able to see where there was missing zinc silica based on the condition of the metalized coating on the photos in Bolton's punchlist. (*See id.*). Additionally, MTS used an inconsistent procedure for overcoating — in some instances epoxy coating was applied first, while in others the zinc silica coating was applied first. (*See id.*).

While it is possible that Bolton was incorrect about some of the deficiencies on his Deficiency List,[10] it is evident that MTS's cathodic protection work was deficient. And SE Bridge did not repair every item on the Deficiency List. Thus, while the Deficiency List may be relevant because Bolton's approval was necessary for LEAD to obtain Final Acceptance and it suggests that MTS's work was deficient, LEAD does not need to demonstrate Bolton was correct about every deficiency to show Defendants reasonably incurred the costs associated with SE Bridge's repairs. (*See* Serrano Test., Aug. 11, 2022 Tr.).

On July 28, 2020, Nicos Vlahos, SE Bridge's Project Manager, confirmed the deficient metalizing work was complete; and on July 30, 2020, Serrano received the FDOT's Final Acceptance. (*See generally* Exs. List, Ex. D110, July 28, 2020 [ECF No. 92]; Final Acceptance). On August 4, 2020, Etcheverry gave LEAD a Final Report on the cathodic protection work. (*See generally* Final Report). Etcheverry conducted his final inspection on April 3, 2020; he could only have based his report on MTS's work, not the work SE Bridge performed over the summer. (*See* Monaghan Test., Aug. 3, 2022 Tr. 93:9–12). MTS insists Etcheverry's Report proves its work

---

[10] Bolton did not seem confident about the metalizing work that was supposed to be performed. For example, he was confused about when to apply the epoxy and relied on descriptions of the procedure appearing in the documents. (*See, e.g.*, Bolton Test., Aug. 9, 2022 Tr. 17–18 ("[S]orry, I'm just reading from the detail here." (alteration added)). Even Costa did not agree with all the items on Bolton's Deficiency List. (*See* Costa Test., Sept. 6, 2022 Tr.).

was not deficient.  (*See id.*).  But Etcheverry did not do all testing necessary to determine whether MTS's work was deficient under the specifications.  (*See* Costa Test., Sept. 6, 2022 Tr.).

### Costs Associated with Supporting SE Bridge

Defendants are seeking a setoff of $24,954.18 for labor and equipment costs incurred to support SE Bridge when it took over to finish MTS's deficient work on the Project.  (*See* Defs.' Prop. Findings & Concl. 34).  The amount includes a 17.5 percent markup.  (*See* Serrano Test., Aug. 11, 2022 Tr.; Specifications 31).

As back-up for labor costs associated with supporting SE Bridge, Pasco reviewed a labor report from LEAD.  (*See* Pasco Test., Sept. 6, 2022 Tr.; *see generally* Exs. List, Ex. D209, Job History Detail Report [ECF No. 129-120]).  LEAD incurred the costs because it had to provide marine support for SE Bridge — just like it had done for MTS.  (*See* Serrano Test., Aug. 11, 2022 Tr.).  LEAD also incurred equipment costs for the marine support.  (*See id.*)  LEAD calculated the equipment costs using Blue Book rates.  (*See* Exs. List, Ex. D261, Ex. 2.1 to Expert Report of Hansell M. Pasco [ECF No. 129-140] 1).

### Pre- and Post-Soil Sampling Costs

MTS concedes that Defendants are entitled to recover $374 for the costs of pre- and post-soil sampling.  (*See* Monaghan Test., Aug. 3, 2022 Tr. 95:17–18; 96:7–10).

### Grate Replacement

Defendants are seeking a setoff of $1,257.25 for the cost of a grate LEAD replaced.  (*See* Defs.' Prop. Findings & Concl. 34).  This amount is supported by a receipt and Defendants' 17.5 percent markup.  (*See* Exs. List, Ex. D204, Grate Invoice [ECF No. 129-116]).

On January 16, 2020, Bolton advised Serrano that a "grate ha[d] been damaged in the MTS staging area" and instructed him to "protect the grate to prevent further damage[.]" (Exs. List, Ex.

P19, Jan. 16, 2020 Email [ECF No. 129-29] (alterations added)).  The email contains pictures of MTS's equipment on the grates.  (*See id.*).  Serrano forwarded the email to Monaghan.  (*See id.*). According to Monaghan, the grate was damaged at the time MTS took over that area from the hydro blasters whose truck drove over it daily (*see id.*); at trial, MTS's counsel confirmed this was still MTS's position, but MTS presented no evidence on this issue (*see* Sept. 9, 2022 Tr.).

Serrano testified that Monaghan's statement in his email response was not true.  (*See* Serrano Test., Aug. 11, 2022 Tr.).  The photographic evidence and Serrano's testimony support a finding that MTS caused the damage to the grate.

*Extended Maintenance of Traffic*

MTS did not begin its structural steel coating on time because it did not have QP1 and QP2 painting certifications.  (*See* Serrano Test., Aug. 11, 2022 Tr.).  MTS claims it did not know it needed QP1 or QP2 coverage, so there was a delay while the parties resolved this.  (*See* Monaghan Test., Aug. 4, 2022 Tr. 16:6–14).  But MTS does not provide support for Monaghan's assertion that the parties understood there was a waiver of this requirement.

Because of MTS's delay, MTS did not start the structural steel coating until January 16, 2020, and then it took 54 days (14 days longer than planned) to complete it.  (*See* Pasco Test., Sept. 6, 2022 Tr.).  LEAD's MOT costs totaled $930.66 per day.  (*See* Exs. List, Ex. D205, Extra Work/Work Order Sheet [ECF No. 129-117] 8).  Defendants are seeking a setoff of $13,029.24 for extended MOT costs incurred due to MTS's failure to complete the structural steel coating within 40 days.  (*See* Defs.' Prop. Findings & Concl. 29).

The MOT was necessary to MTS's structural steel painting because LEAD needed to close a lane for stationary equipment.  (*See* Serrano Test., Aug. 11, 2022 Tr.).  A temporary concrete barrier is the preferred form of traffic control.  (*See id.*).  This would not have been a problem had

MTS done the work as it was supposed to in 2019, but because it did not do it until early 2020, LEAD had to cover the costs of daily lane closures to maintain traffic.  (*See id.*).

The $13,029.24 include 17.5 percent markups for the labor, materials, and equipment components; ten percent and an additional five percent for the Subcontract component; and 0.80 percent for "total liability and bond[.]"  (*Id.*).  MTS did not present any evidence suggesting these markups are improper.

### 2.    *Defendants' Insurance-Related Setoffs*

*Workers' Compensation Insurance Premiums*

Defendants seek a setoff of $96,571.67 for costs incurred because of premium increases for workers' compensation insurance between 2019 and 2024.  (*See* Trial Demonstrative – Damages Chart).  MTS concedes Defendants are entitled to this setoff.  (*See id.*; Stip. 10–11).

*Commercial General Liability and Excess Liability Insurance Premiums*

Defendants seek a setoff of $306,290.65 for costs incurred because of premium increases for commercial general liability insurance between 2020 and 2024.  (*See* Defs.' Prop. Findings & Concl. 34–35).  They also seek a setoff of $206,211.70 for costs incurred because of premium increases for excess liability insurance between 2020 and 2024.  (*See id.*).

To support these setoffs, LEAD offered Beane, its insurance consultant, as a fact witness. (*See* Beane Test., Sept. 7, 2022 Tr.; *See* Pl.'s Witness List [ECF No. 91-3] 1).  He is employed by NHG Specialty, a company specializing in consulting on construction risk management, and he is the Chief Risk Officer at Coastal Construction.  (*See id.*).  When Beane began looking for insurance for LEAD in September 2020, after the Accident, the premiums for general liability and excess liability insurance policies increased.  (*See id.*).  This continued when he investigated policies for LEAD in 2021 and 2022.  (*See id.*).

With Beane's help, Defendants prepared two models to show their expected increases in general liability and excess liability insurance premiums — the increases that serve as the measures of the claimed damages.  (*See* Exs. List, Ex. D12, GL Premiums Increases 2018–2022 [ECF No. 129-67]; Exs. List, Ex. D32, LEAD Engineering Excess Premium Increases 2019–2022 [ECF No. 129-77]).  The models measure damages by projecting the amounts the premiums did or could increase from the year before to the years after the Accident, and then subtracting the market average premium increases to determine how much of the increases MTS is responsible for.  (*See id.*).  Beane calculated the expected premium increases by applying a rate to the amount of exposure, which was determined using revenue projections.  (*See id.*; Beane Test., Sept. 7, 2022 Tr.).  Gonzalez provided Beane the revenue projections for the models.  (*See* Gonzalez Test., Sept. 7, 2022 Tr.).  The rate was determined by dividing the premiums by the exposure.  (*See* Ray Test., Sept. 7, 2022 Tr.).

Beane admitted to several flaws in the models predicting excess premium increases.  First, auto losses were embedded into rates, and auto loss history has an impact on LEAD's premiums. (*See* Beane Test., Sept. 7, 2022 Tr.).  The increases in excess premiums were thus inappropriately driven up by the auto loss history included in the rates.  Beane also admitted that additional terrorism coverage was included in the policies used to determine the rates.  (*See id.*).  Beane admitted he should have excluded the terrorism coverage because it inappropriately drove up the higher excess premium rates.  (*See id.*).

Robert Ray, Defendants' insurance expert, opined on whether the setoffs Defendants seek for the increases in insurance premiums are fair and reasonable.  (*See* Ray Test., Sept. 7, 2022 Tr.). While Ray has many years of experience in the insurance industry — in particular, in underwriting — he has never sold general liability or excess liability insurance to any contractor in Miami-Dade

County or Broward County.  (*See id.*).  Additionally, his firm does not do business in the construction industry.  (*See id.*).

Ray did not perform an independent damages analysis to calculate how much of the predicted increase in insurance premiums could be reliably attributed to MTS.  (*See id.*).  Instead, he merely *believed*, based on his underwriting experience, that Beane's calculations were fair and reasonable.  (*See id.*).  Even within his cursory review, Ray admitted to issues with Beane's calculations.  For example, Ray conceded the rates Beane used for his models did not match the rates the insurance companies calculated.  (*See id.*).  Ray also "couldn't recall" whether an accurate estimate of future revenue was used to predict the insurance premiums.  (*Id.*).

MTS's insurance expert, Brad Dempton, owns Construction Casualty Insurance, an insurance brokerage firm specializing in the construction industry.  (*See* Dempton Test., Sept. 8, 2022 Tr.).  While Dempton is not an underwriter, he has years of experience working closely with underwriters to price insurance premiums.  (*See id.*).  According to Dempton, Defendants' analysis of predicted future losses is unreliable because it is unlikely that a subcontractor's failure to maintain *workers' compensation* insurance will impact pricing for *general liability and excess liability* premiums.  (*See id.*).  This is particularly true when no claims have been brought under the general liability and/or excess liability policies in relation to an incident — as is the case here. (*See id.*).  Dempton also testified that any increase in the premiums that did occur could easily be explained by aspects of LEAD's insurance loss history that Beane and Ray did not consider, like the auto loss history; the frequency of LEAD's losses; the changing market conditions in South Florida, including fewer carriers and hardening market conditions; and other factors that are difficult to predict.  (*See id.*).

While Ray has direct underwriting experience, he has never worked in the construction industry.  (*See* Ray Test., Sept. 7, 2022 Tr.).  More importantly, Ray did not even conduct his own damages analysis to corroborate Defendants' damages calculation.  (*See id.*).  Rather, he relied on Beane's damages models, despite both he and Beane admitting those models are flawed. Dempton's explanation, based on his industry expertise, that any increase in general liability and/or excess liability premiums probably would not be attributable to a subcontractor's failure to maintain workers' compensation insurance — and certainly not in the amounts Defendants claim — is highly credible and reliable.

### III.  CONCLUSIONS OF LAW

The Court is asked to decide whether MTS is entitled to recover for its work stoppage and hazardous materials claims, and whether Defendants are entitled to any of their construction or insurance-related setoffs.

The substantive law of Florida applies.  First, the forum state is Florida.  *See Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991) ("In a diversity case, a federal court applies the substantive law of the forum state, unless federal constitutional or statutory law is contrary." (citation omitted)).  Second, Article 5.6 of the Subcontract provides that the Subcontract "shall be governed by the laws of the State of Florida[.]" (Subcontract 37 (alteration added)).  *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000) ("Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." (footnote call number omitted)).

MTS did not have to prove at trial that it was owed a remaining balance of $682,339.47 on the Subcontract because Defendants stipulated this is the amount owed.  (*See* Stip. 9).  But MTS had the burden of proving it is entitled to recover damages on its work stoppage and hazardous

materials claims.  *See Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc.*, 611 So. 2d 564, 565 (Fla. 4th DCA 1992) (plaintiff has the burden of proving damages flowing from breach of contract).  Defendants had the burden of proof on their setoff claims.  *See Ness v. Cowdery*, 149 So. 33, 34 (Fla. 1933).  The Court addresses the claims in turn, beginning with MTS's.

### A.    MTS is not entitled to recover on its work stoppage claim.

MTS is seeking $11,000.00 on its work stoppage claim; Defendants insist that MTS did not satisfy the Subcontract requirements.  The Court agrees that Defendants are not liable for damages on the work stoppage claim because MTS failed to comply with the terms of the Subcontract and the claimed damages are speculative.

First, the Subcontract bars MTS from recovery.  Courts construe contracts according to their plain language.  *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957) ("The writing itself is the evidence of what [the parties] meant or intended by signing [the contract].  The test of the meaning and intention of the parties is the content of the written document." (alterations added; citation omitted)).

Article 4.3.1 of the Subcontract defines MTS's rights in the event the "Owner suspend[s] or delay[s] the Prime Contract or any part of the Prime Contract which includes Subcontractor's Work[.]"  (Subcontract 32 (alterations added)).  Article 4.3.1 applies since the FDOT's representative, Bolton, ordered the work stoppage.  When the "Subcontractor believes that additional compensation . . . is due as a result of such suspension or delay, Subcontractor shall *immediately* notify Contractor in writing."  (*Id.* (alteration and emphasis added)).  MTS did not notify LEAD "immediately . . . in writing" about the claim, as Article 4.3.1 requires.  (Subcontract 32 (alteration added)).

Despite testimony that MTS provided written notice — via text messages and emails — within days of the stoppage (*see* Monaghan Test., Aug. 3, 2022 Tr. 127:11–15), MTS offered no record evidence of those communications.  The earliest possible written notice MTS points to was dated November 13, 2018 (*see* Exs. List, Ex. P164 [ECF No. 129-55] 2), nearly a month after the work stoppage.

Article 4.3.1 further bars MTS's work stoppage claim because Articles 4.3.1 and 5.1.4 preclude monetary compensation for delays that do not impact the critical path.  (*See* Subcontract 32, 35).  MTS concedes the work stoppage did not impact the Project's critical path.  (*See* Monaghan Test., Aug. 3, 2022 Tr. 125:8–10).  Article 4.3.1 provides that "Subcontractor shall submit its request for additional compensation . . . on account of [the Owner's suspension of Subcontractor's Work] in accordance with the requirements of Article 5.1.4."  (Subcontract 32 (alterations added)).  Article 5.1.4 states, "Subcontractor shall not under [any] circumstances be entitled to any monetary compensation for any delays or impacts whatsoever to any activities or items of Work that are not a Controlling Work Item, as defined in the Prime Contract."  (*Id.* 35 (alteration added)).  The Prime Contract incorporates the FDOT Standard Specifications, which define "Controlling Work Items" as "[t]he activity or work item on the critical path having the least amount of total float[.]"  (*Id.* 243 (alteration added)).  Because the stoppage did not impact the critical path, no Controlling Work Items were impacted; MTS is not entitled to recover compensation for items that are not on the critical path.  (*See id.* 25, 32).

Second, MTS fails to meet its burden of proving its work stoppage damages with reasonable certainty.  In Florida, "[u]ncertainty of the amount or difficulty of proving the amount of damage with certainty" is not necessarily a bar to recovery.  *Gov't of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1376 (S.D. Fla. 2002) (alteration added; citation omitted).  Nonetheless,

"[d]amages cannot be based on speculation or guesswork[] but must have some reasonable basis in fact." *Air Caledonie Int'l v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1340 (S.D. Fla. 2004) (alterations added; citation omitted). And recoverable damages are limited to those which "could have been reasonably expected to flow from the breach." *Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, 1211 (M.D. Fla. 2002) (quoting *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1532 n.11 (11th Cir. 1985) (citation and quotation marks omitted)); *see also Scott v. Rolling Hills Place Inc.*, 688 So. 2d 937, 940 (Fla. 5th DCA 1996) (Goshorn & Thompson, J.J., concurring) (reiterating Florida's adherence to the long-established rule of *Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854) that "[d]amages which flow naturally from the breach, and were foreseeable by the breaching party at the time the contract was entered, are recoverable." (alteration added)).

MTS's key witness on the work stoppage claim was Cardona, who was not even an MTS employee at the time of the stoppage. (*See* Cardona Test., Aug. 4, 2022 Tr. 89:22). Despite not experiencing the work stoppage first-hand, Cardona was responsible for preparing the claim submitted to LEAD — nearly 18 months *after* the event. (*See id.* 125:20–126:1). At trial, Cardona was unable to substantiate key components of the claim. He was unable to describe the equipment appearing in the claim (*see id.* 127:22–25) and could not remember how he generated the prices (*see id.* 130:14). He also could not recall whether he used the standby rate to calculate the costs associated with idle equipment. (*See id.* 132:18–21).

Serrano, Defendants' witness, testified regarding the Blue Book's standby rates, which differed substantially from the rates Cardona used. (*See* Serrano Test., Aug. 8, 2022 Tr.). According to Serrano, the approximate value of the work stoppage claim — after accounting for Cardona's mistakes — was closer to $11,000.00. (*See id.*). MTS then tried to stipulate that $11,000.00 was the correct amount, and that it had made a mistake calculating the claim. (*See*

Sept. 6, 2022 Tr.).  But the imprecise testimony of Defendants' witness alone is not sufficient evidence for MTS to meet its burden of showing, with reasonable certainty, that it incurred $11,000.00 in damages.  *See Air Caledonie Int'l*, 315 F. Supp. 2d at 1340.

**B.    MTS is not entitled to recover on its hazardous materials claim.**

Next, MTS knowingly waived its hazardous materials claim, because it never requested that LEAD appeal the FDOT's denial of the claim, and it never provided security.

MTS failed to comply with Article 5.2.2's requirements for claim prosecution (*see* Subcontract 36), despite LEAD's insistence that MTS do so or else it would waive its claim (*see* Monaghan Test., Aug. 3, 2022 Tr. 79:2–10).  Under Article 5.2.2, "Subcontractor's written request to appeal an Owner ruling or decision must be delivered to Contractor within . . . five (5) calendar days from Contractor's notice to Subcontractor of the Owner's ruling or decision . . . or Subcontractor shall be deemed to have irrevocably waived its claim."  (*Id.* (alterations added)). Because Bolton's claim denial was a decision by the FDOT, MTS waived any right it had to recover on the claim when it did not request an appeal within five days of the decision.

MTS does not dispute that LEAD requested $75,000 in security from MTS to cover the costs of an appeal.  (*See* Monaghan Test., Aug. 3, 2022 Tr. 79:2–10).  Under Article 5.2.2, "Subcontractor shall post whatever security may be required by Contractor to cover Contractor's costs and expenses, including attorneys' fees, prior to and as a condition precedent to Contractor's proceeding against the Owner on the Subcontractor's behalf." (Subcontract 36).  LEAD reminded MTS about the security requirement several times and informed MTS that LEAD was not waiving it.  MTS admitted it never complied.  Although LEAD may have decided to appeal the FDOT's denial, LEAD had no obligation to proceed on MTS's behalf because MTS never posted security.

Even if MTS had not waived its hazardous materials claim, MTS also agreed, under Articles 2.2.20 and 5.2.3 of the Subcontract, that it would not be able to recover any payment that the FDOT had not yet made to LEAD. (*See id.* 13, 36). According to MTS, these provisions are invalid as a matter of law. MTS points to *OBS Company, Inc. v. Pace Construction Corporation*, 558 So. 2d 404, 405 (Fla. 1990), for the proposition that Defendants cannot shift the risk of nonpayment onto MTS. (*See* Pl.'s Prop. Findings & Concl. 9). Not so.

In *OBS Company*, the court found that a similar subcontract provision did not preclude the subcontractor from recovering because, under Florida law, the intent to shift the risk of nonpayment must be unambiguous. *See* 558 So. 2d at 405. The ambiguity in *OBS Company* was the result of a contradiction between the language in the subcontract and prime contract. *See id.* Here, MTS points to no provision of the Prime Contract that contradicts Articles 2.2.20 and 5.2.3 — provisions that unambiguously shift the risk of nonpayment to MTS. (*See* Subcontract 13, 36). Thus, Articles 2.2.20 and 5.2.3 of the Subcontract also preclude MTS from recovering anything beyond the $219,000 that the FDOT paid for the hazardous materials claim.

### C. MTS is entitled to recover $278,038.22 as the remaining balance on the Subcontract.

Defendants stipulate that MTS is entitled to $682,339.47, minus their claimed setoffs. As explained below, Defendants are entitled to all their construction-related setoffs and setoffs related to workers' compensation insurance. Defendants are not entitled to setoffs for their speculative commercial general liability and excess liability insurance claims.

Defendants reasonably apply markups to their setoff claims of ten percent on the first $50,000 and five percent on any amount over $50,000. The Prime Contract supports these markups. (*See id.* 263). The markups Defendants applied to the claims for costs incurred to support SE Bridge and extend MOT work are also reasonable; the 17.5 percent rate is supported by FDOT

Standard Specification 4-3.2.1(4)(a) (Specifications 31), and the composite rate applied to the MOT claim is supported by the Extra Work/Work Order Sheet (*see id.* 8). Defendants are entitled to a total setoff of $404,301.25, which includes markups. Thus, MTS is owed its remaining balance, which equals $278,038.22.

### D. Defendants' Construction-Related Setoffs

*LEAD is entitled to a $58,791.51 setoff for completing MTS's Class V Painting.*

"The measure of damages for cost to complete after breach of a construction contract where the contractor fails to complete performance is the difference between the contract price and the reasonable cost to complete the improvements in accordance with the contract." *Am. Structural Sys., Inc. v. R.B. Gay Const. Co.*, 619 So. 2d 366, 367 (Fla. 1st DCA 1993) (citations omitted). MTS admits it is liable for costs reasonably incurred by LEAD to complete the Class V Painting, but it disagrees as to the amount. (*See* Stip. 4). LEAD incurred $58,791.51 to complete the Class V Painting. (*See id*. 17). MTS insists the correct amount is $43,301.25. (*See* Pl.'s Prop. Findings & Concl. 5).

Defendants argue that the Court should award them the $58,791.51 they incurred, because it is the amount LEAD paid SE Bridge to complete the Class V Painting. (*See* Defs.' Prop. Findings & Concl. 34). MTS states its measure is better because it represents the lower amount LEAD could have paid had it attempted to find the lowest cost alternate painter. (*See* Monaghan Test., Aug. 3, 2022 Tr. 95:22–96:6). Defendants have the better argument. They are entitled to recover the full $58,791.51 because under the circumstances, that is the actual price SE Bridge charged LEAD to finish the Class V Painting and it was reasonable. *See Barile Excavating & Pipeline Co. v. Kendall Props., Inc.*, 462 So. 2d 1129, 1130 (Fla. 4th DCA 1984) (finding that the

trial court erred when it "based its judgment on the estimated cost of completion" because the "actual cost figures were available").

MTS fails to show that Defendants incurred Class V Painting costs that could have been reasonably avoided. Under the law of "avoidable consequences," "one seeking damages as the result of another's act cannot recover those damages which he could have avoided by the exercise of reasonable care." *Jenkins v. Graham*, 237 So. 2d 330, 332 (Fla. 4th DCA 1970) (citation omitted). The avoidable consequences doctrine is different from the duty to mitigate. "There is no actual 'duty to mitigate'" under the avoidable consequences doctrine "because the injured party is not compelled to undertake any ameliorative efforts." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009) (citation omitted). "The doctrine simply 'prevents a party from recovering those damages inflicted by a wrongdoer that the injured party *could have* reasonably avoided.'" *Id.* (citation omitted; emphasis in original). In other words, "the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through 'ordinary and reasonable care,' without requiring undue effort or expense." *Id.* (citation omitted).

MTS understood from Article 3.1.3 of the Subcontract that time was of the essence. (*See* Subcontract 16). Defendants did not have an obligation to search for the least costly subcontractors to complete each remaining component of MTS's unfinished work. It would have been unreasonably burdensome and costly for LEAD to attempt to replace MTS with several new subcontractors for each component of MTS's unfinished work with little time remaining to complete the Project and the prospect of liquidated damages if LEAD went over its contract days. The Court rejects MTS's avoidance argument and finds Defendants are entitled to a $58,791.51 setoff for the costs incurred by LEAD to complete the Class V Painting.

*LEAD is entitled to a $15,750 setoff for SE Bridge's mobilization costs.*

Defendants are entitled to a setoff of $15,750 for the work incurred by LEAD for SE Bridge to mobilize.  These costs were reasonably incurred, because there were labor and equipment costs associated with bringing SE Bridge's equipment onto the site.  (*See* Gonzalez Test., Aug. 10, 2022 Tr.).  MTS presented no evidence to show that $15,000 are unreasonable for mobilization under the circumstances.  Notably, MTS's Schedule of Prices in the Subcontract included $240,000 in mobilization costs, which represented a similar percentage of the total contract price.  (*Compare* Subcontract 57 *with* SE Bridge Subcontract 58).

*Defendants are entitled to a $144,483.28 setoff for metalizing, connection plates, and zinc silica coating.*

Defendants are entitled to setoffs for all three components of cathodic protection work they paid SE Bridge to complete — the metalizing, additional connection plates, and zinc silica coating.  These setoffs total $144,483.28.  The work is supported by paid invoices from SE Bridge.  (*See* Pasco Test., Sept. 6, 2022 Tr.).

As discussed, MTS's work was deficient under the Subcontract.  Moreover, regardless of whether the work was deficient, under the Subcontract and Prime Contract, Bolton's approval was necessary for LEAD to obtain Final Acceptance.  Under Articles 2.2.20, 3.3.21, and 3.3.5 of the Subcontract, for LEAD to receive Final Acceptance, there could no deficient items.  (*See* Serrano Test., Sept. 6, 2022 Tr.; *see also* Subcontract 13 ("[LEAD's] receipt of payment from [the FDOT] . . . is an absolute condition precedent to any duty or obligation of [LEAD or Berkshire] to make any payment to [MTS] pursuant to any application for payment or compensation" (alterations added)); 19 ("[a]ll work performed . . . shall not be deemed accepted by [LEAD] until accepted by [the FDOT]" (alterations added)); 27 ("[MTS] shall be bound to [the FDOT]'s interpretation of the Prime Contract, including, without limitation, the drawings, plans and specifications in the

same manner as [LEAD] is bound under the Prime Contract" (alterations added))).  As the FDOT's representative on the Project, Bolton was tasked with approving MTS's work.  It was therefore not only reasonable but necessary for LEAD to complete the deficient work.

MTS argues that LEAD did not take reasonable steps to avoid unnecessary costs associated with the metalizing repair and re-work.  This statement is unsupported.  LEAD took reasonable care to ensure the FDOT did not require it to re-work areas that satisfied the technical specifications.  (*See* Serrano Test., Aug. 11, 2022 Tr. (describing steps that LEAD took to dispute items on Bolton's Deficiency List)).  Again, Florida law only required that LEAD take "ameliorative actions that could have been accomplished through ordinary and reasonable care." *Sys. Components Corp.*, 14 So. 3d at 982 (quotation marks and citation omitted).  By taking the time to work with Bolton to narrow the items on his Deficiency List, LEAD satisfied the ordinary and reasonable standard.

*Defendants are entitled to a $24,954.18 setoff for costs to support SE Bridge.*

Defendants reasonably incurred $24,954.18 in costs associated with supporting SE Bridge. LEAD incurred labor and material costs to support SE Bridge as it finished and re-worked MTS's incomplete cathodic protection and painting.  (*See generally* Pasco Test., Sept. 6, 2022; Ex. 2.1 to Expert Report of Hansell).

*Defendants are entitled to a $374 setoff for pre- and post-soil sampling.*

Defendants reasonably incurred $374 to conduct pre- and post-soil sampling.  (*See* Defs.' Prop. Findings & Concl. 34; Monaghan Test., Aug. 3, 2022 Tr. 95:17–18).

*Defendants are entitled to a $1257.25 setoff for grate replacement.*

Defendants are entitled to a $1,257.25 setoff for costs related to grate replacement.  (*See* Defs.' Prop. Findings & Concl. 34).  The Court credits Serrano's testimony and the photographic

evidence, finding that MTS caused damage to the grate.  Additionally, under Article 3.3.8 of the Subcontract, "[s]hould [MTS's] operations cause . . . damage to the Work, person or property of [the FDOT] . . . [LEAD] may remedy the damage caused thereby and deduct the reasonable cost thereof from any amounts due . . . [MTS]."  (Subcontract 22–23 (alterations added)).

> *Defendants are entitled to a $15,309.36 setoff for extended maintenance of traffic.*

Defendants claim they are entitled to a $15,309.36 setoff related to extended MOT. Because of MTS's delay in performing the structural steel work and its failure to take steps to maintain traffic, LEAD had no choice but to extend its MOT to maintain safe conditions on site. Additionally, MTS's argument that the parties had an understanding that they would waive the QP1 and QP2 certification requirements is unsupported by the FDOT Standard Specifications, which are incorporated into the Subcontract (*see* Subcontract 1) and require these certifications (*see id.* 165).  Accordingly, Defendants meet their burden of proving they are entitled to the $15,309.36 setoff.

### E.   Defendants' Insurance-Related Setoffs

> *Defendants are entitled to a $96,571.67 setoff for premium increases for workers'*
> *compensation insurance.*

The parties stipulate that Defendants are owed a setoff of $96,571.67 for costs incurred because of premium increases for workers' compensation insurance between 2019 and 2024.  (*See* Trial Demonstrative – Damages Chart).

> *Defendants are not entitled to their general liability and excess liability insurance*
> *setoffs.*

Defendants have not met their burden of proving that the setoffs they claim for increases in general liability and excess liability premiums are a reasonable measure of damages *for which MTS is responsible.*

"[T]here must be some reasonable basis in the evidence to support" a damages award. *Smith v. Austin Dev. Co.*, 538 So. 2d 128, 129 (Fla. 2d DCA 1989) (alteration added; citations omitted). "[I]t is incumbent upon the party seeking damages to present evidence to justify an award of damages in a definite amount." *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, No. 07-cv-326, 2009 WL 1513400, at *14 (M.D. Fla. May 27, 2009) (alteration added; quoting *Smith*, 538 So. 2d at 129 (citation omitted)). *See also United Auto. Ins. Co. v. Colon*, 990 So. 2d 1246, 1248 (Fla. 4th DCA 2008) ("It has long been accepted in Florida that a party claiming economic losses must produce evidence justifying a definite amount." (citations omitted)).

In *W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348 (Fla. 1989), the Florida Supreme Court provided a description of a plaintiff's burden to recover prospective profits; the observations are useful here in gauging whether Defendants have met their burden of proof on the general liability and excess liability insurance setoffs they seek against MTS, which rely on a projected revenue model. In *W.W. Gay Mechanical*, the court explained:

> The two seminal Florida cases on recovery of prospective profits are *Twyman v. Roell*, 123 Fla. 2, 166 So. 215 (Fla. 1936), and *New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.*, 122 Fla. 718, 166 So. 856 (1935). In *New Amsterdam* this Court held that prospective business profits are generally too speculative and dependent on changing circumstances to be recovered. *New Amsterdam* provided an exception allowing the plaintiff to show the amount of his loss by competent proof. However, this exception only applied to the interruption of an established business. *Twyman* . . . did not limit recovery to established businesses. . . . The Court [in *Twyman*] provided further that the "uncertainty which defeats recovery in such cases" is the cause of the damage rather than the amount. . . .
>
> We follow the holding in *Twyman*. A business can recover prospective profits regardless of whether it is established or has any "track record." The party must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined.

*Id.* at 1350–51 (alterations added).

Also instructive is *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43 (Fla. 3d

DCA 2006).   There, the court affirmed exclusion of the plaintiff's expert witness on damages,

stating,

> Mr. Reto based his damages calculation on future revenue and cash flow projections
> that had been prepared by Norman Fixel.  Mr. Reto never verified these projections
> nor prepared his own projections. . . .  [W]e agree that Mr. Reto's damage
> calculations were too speculative, and conclude that the trial court did not abuse its
> discretion in excluding his testimony.  *See Montage Group, Ltd. v. Athle-Tech
> Computer Sys., Inc.*, 889 So. 2d 180, 195 (Fla. 2d DCA 2004) (concluding that a
> plaintiff's proof of claimed business damages were [sic] inadequate to support the
> jury's business damage award because "it was far too speculative and uncertain");
> *North Dade Cmty. Dev. Corp. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. 3d
> DCA 2002) (reversing an award of future profits when the only evidence supporting
> the award was a page of projected earnings in a business prospectus that was "little
> more than an unsupported wish list of what the lessee hoped would occur in the
> coming years") . . . .
>
> Fixel, Inc. asserts that we should not rely on the above authorities, as they
> relate to lost profit damages while Fixel, Inc. is seeking damages based upon the
> market value of its business at the time of its destruction.  We disagree.  It is as
> inappropriate to use purely speculative forecasts of future revenue to determine the
> market value of a business as it is to use such speculative forecasts in determining
> lost future profits.

*Id.* at 46 (alterations added).

Defendants' general liability and excess liability insurance setoffs are based on speculative

and — admittedly — imprecise forecasts.  Defendants are not entitled to recover damages for the

prospective increases in general liability and excess liability insurance premiums, the amounts of

which are determined in part based on unsupported revenue projections, because Defendants have

failed to show MTS's breach of the Subcontract caused the damages and that there is some standard

by which the amount of damages may be adequately and reliably determined.  *See W.W. Gay

Mechanical Contractor*, 545 So. 2d at 1350.

MTS's expert witness, Dempton,[11] persuasively explained how nearly every aspect of Defendants' models for estimating increases in general liability and excess liability premiums — for which Defendants ask that MTS be held responsible — is speculative.  (*See* Dempton Test., Sept. 8. 2022 Tr.).  The exposure, which the estimated composite rate is applied to, is determined based on projected revenue.

Defendants have not provided sufficient reliable evidence to prove MTS's failure to carry workers' compensation insurance caused the increase in LEAD's general liability and excess liability premiums.  Calculations of damages based on insurance premium increases are inherently speculative.  It is very difficult to reasonably predict what insurance premiums will be, and even more difficult to isolate how much of a prospective increase is attributable to any one factor.  As Dempton explained, is unlikely that a subcontractor's failure to maintain workers' compensation insurance will impact pricing for general liability and excess liability premiums ─ especially when, as here, no claims have been brought under the general liability and excess liability policies in relation to the Accident.  (*See* Dempton Test., Sept. 8, 2022 Tr.).

To determine the portion of prospective increases in premiums MTS is allegedly responsible for, Defendants subtracted the average market increase in premiums, which they estimated to be 15 percent of the total increase.  (*See* Ray Test., Sept. 8, 2022 Tr.).  As discussed,

---

[11] The Court does not see any reason for excluding Dempton's testimony under Federal Rule of Evidence 702.  At trial, Defendants cited *Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145 (D. Alaska 2005), to support their argument that the Court should exclude Dempton's testimony because he is not an underwriter (*see* Sept. 8, 2022 Tr.).  *Inlet Fisheries* is distinguishable.  There, the excluded expert had no experience pricing policies in the relevant marine industry.  *See* 389 F. Supp. 2d at 1154.  Here, by contrast, Dempton has extensive experience working with underwriters to price insurance for construction companies.  (*See* Dempton Test., Sept. 8, 2022 Tr.).  If anything, Defendants' expert, Ray, is the one less qualified as between the two under *Inlet Fisheries*, given his lack of experience in pricing insurance in the construction industry.  The Court has wide discretion in determining whether to admit or exclude expert testimony.  *See Collins v. Marriot Int'l, Inc.*, No. 09-Civ-22423, 2012 WL 12948671, at *1 (S.D. Fla. July 2, 2012).

they did not account for the impacts of additional loss history, such as LEAD's automobile loss history; the additional cost of terrorism coverage that was included in the estimates they used for the composite rates; or the increases attributable to South Florida-specific market conditions.  All of these are errors in the "analysis" Defendants employed.

Defendants also failed to present reasonable yardsticks to measure the revenue projections they used as inputs for their models.  Beane used revenue projections from Gonzalez for the models.  (*See* Beane Test., Sept. 7, 2022 Tr.).  Gonzalez testified as to his basis for these revenue projections and why they differed from the actual revenue so substantially.  (*See* Gonzalez Test., Sept. 7, 2022 Tr.).  Certainly, a business owner or officer may testify as to profit projections on the theory that he or she has a better understanding and knowledge of his or her own business, even if not an expert in the field.  *See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1223 (11th Cir. 2003); *Malloy v. Monahan*, 73 F.3d 1012, 1016 (10th Cir. 1996) (plaintiff engaged in the business of rehabilitating and selling residential properties qualified to testify regarding projected sales of houses because of his special knowledge of the properties).  But the opinion must be grounded in fact and not be mere speculation.  *See Malloy*, 73 F.3d at 1016.  Here, LEAD provided insufficient evidentiary support for Gonzalez's revenue projections. (*See* Gonzalez Test., Sept. 7, 2022).

Aside from the unsupported revenue projections used to determine the exposure, the composite rates and expected premiums used in Defendants' models are also speculative.  As Ray admitted, the composite rates Beane applied to the exposure amounts to estimate the premiums did not match the composite rates from the actual policy proposals from the insurers.  (*See* Ray Test., Sept. 7, 2022 Tr.).

Defendants' models for approximating damages from anticipated increases in general and excess liability insurance premiums are not reliable.  Given the failure to prove causation and the speculative nature of the models created by LEAD and Beane,[12] Defendants did not satisfy their burden of showing they are entitled to a $211,390.65 setoff for anticipated increases in general liability and excess liability insurance premiums.

*LEAD is entitled to a setoff of $48,610 for attorneys' fees.*

Defendants are entitled to a setoff against the Subcontract balance in the amount of $48,610 for attorneys' fees LEAD incurred in its termination of MTS, an amount MTS has stipulated is reasonable.  (*See* Stip. 10).

**F.      Berkshire is Liable**

Under Florida law, "[t]he liability of a surety is coextensive with that of the principal." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 198 (Fla. 1992) (alteration added; citations omitted).  Berkshire's argument that it is not liable to MTS assumes that LEAD does not owe any money to MTS.  Because LEAD owes MTS $278.038.22, Berkshire is liable. The parties stipulate, however, that LEAD must indemnify Berkshire.  (*See* Stip. 5).

**IV.      CONCLUSION**

MTS failed to show that it is entitled to damages for the remaining balance of its hazardous materials and work stoppage claims.   After applying the construction-related and workers' compensation setoffs and the special damages Defendants are entitled to, Defendants owe MTS a

---

[12] Under Federal Rule of Evidence 701, "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is . . . not based on . . . specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 (alterations added).  Indeed, lay witnesses especially may not speculate based on specialized industry knowledge, *see Rli Ins. Co. v. Alfonso*, No. 19-Civ-60432, 2021 WL 430720, at *19 (S.D. Fla. Feb. 8, 2021), which is what Beane did here when he attempted to corroborate the methodology of the models based on his experience in the insurance industry.

remaining unpaid balance of $278,038.22 for the work it performed on the Subcontract prior to MTS's termination.

Accordingly, it is

**ORDERED AND ADJUDGED** that final judgment will entered by separate order for Plaintiff, MTS, and against Defendant, Berkshire, and Intervenor Defendant, LEAD.  The Court reserves jurisdiction to address the parties' requests for attorneys' fees.  No motion for fees or costs may be submitted until the time for filing a notice of appeal has passed; if a party appeals the Final Judgment, no motion for fees or costs may be filed until resolution of the appeal.  The parties are directed to submit a proposed order[13] of final judgment by no later than January 30, 2023.

**DONE AND ORDERED** in Miami, Florida, this 25th day of January, 2023.

**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[13] Under the CM/ECF Administrative Procedures, proposed orders shall be filed as an attachment to a motion, notice, or other filing.  The proposed document must also be e-mailed to altonaga@flsd.uscourts.gov.  The proposed document shall be submitted by e-mail in Word format.  The e-mail line and the name of the attachment should include the case number, followed by a short description of the attachment (e.g., 00-cv-00000 Order).